[No. 31841. Department Two. April 24, 1952.]

ERNEST RUSTUEN, *Respondent*, v. STEPHAN APRO *et al.*, *Appellants*.[1]

[1]Reported in 243 P. (2d) 479.

*Chavelle & Chavelle*, for appellants.
*Clark, Stone & Hoover*, for respondent.

HAMLEY, J.—Ernest Rustuen, the prospective purchaser of a restaurant business in Seattle, brought this action against the sellers, Stephan Apro and wife, to recover thir-

teen hundred dollars paid on the purchase price. Apro's attorneys and their respective wives were also named as defendants, but the action was dismissed with prejudice as to them. Apro will be herein referred to as if he were the only defendant and appellant.

The theory of the action was for money had and received, it being alleged that the transaction never culminated in an executed contract of purchase and sale. Apro answered with a general denial. During the course of the trial, he was permitted to file an amended answer. He there alleged, by way of affirmative defense, that he had been discharged in bankruptcy proceedings pursuant to schedules listing Rustuen as a creditor. Rustuen thereupon filed an amended reply in which he alleged that the discharge in bankruptcy was ineffectual against plaintiff for the reason that defendant obtained the thirteen hundred dollars by fraud, deceit, misrepresentation and false pretenses.

The case was tried to the court without a jury. The evidence indicates that the parties entered into negotiations for the purchase of the restaurant on August 22, 1949. Apro proposed to sell the restaurant, including all equipment except the neon sign, for $7,750. Sixty dollars was to be paid as earnest money. There was to be a further cash payment of $1,240 when the sale was consummated. The remainder of the purchase price ($6,450) was to be paid by Rustuen's assumption of the debts against the business, and by permitting Apro to maintain pinball machines on the premises until the proceeds therefrom equaled the difference, if any, between the amount of debts assumed and the $6,450 balance.

Apro told Rustuen at this time that the debts against the business, consisting of six named items, approximated $5,237. Apro also told Rustuen that he (Apro) would provide the necessary bulk sales affidavit.

The parties then, on the same day, went to the office of Apro's attorney, where an earnest money agreement incorporating the terms referred to above was prepared and executed. Rustuen paid the sixty-dollar earnest money and went into possession of the restaurant the next morning.

The taking of immediate possession was upon the suggestion of Apro, who stated that it would enable Apro to expedite the closing of the transaction.

On the following day Rustuen and Apro went to the office of the latter's attorney, expecting to find the final contract and bulk sales affidavit ready. These instruments had not yet been prepared, however, and the attorney was not in the office. Rustuen left at the attorney's office the remaining $1,240 which would be due under the contract. Apro later returned to the attorney's office and picked up the $1,240. He used a portion of it to pay debts against the business and the rest for his own personal expenses.

An unexecuted form of bulk sales affidavit and a form of contract were delivered to Rustuen on August 25, 1949. The form of affidavit listed no debts against the business, but contained this paragraph:

"That I state that with the exception of the taxes and pinball obligations there are no other obligations against said business and in the event that there are any other obligations against said business, I [Apro] agree to make immediate adjustment."

The form of final contract contained at least two provisions not mentioned in the earnest money agreement. The final contract was in the form of a conditional sales contract, whereas the earnest money receipt had not indicated that this would be the form of contract. The final contract specified that the purchase price, including the payment of all obligations assumed, would be paid within twelve months, with interest thereafter at the rate of five per cent on any unpaid balance. The earnest money agreement contained no such provision.

Upon receiving the form of contract and form of bulk sales affidavit, Rustuen took them to his own attorney for examination. His attorney indicated dissatisfaction with the form of both instruments. One or more conferences were then had between the parties and their respective attorneys, but they were unable to compose their differences. The bulk sales affidavit was not executed and the final contract was not signed. Rustuen tendered back the keys to the restau-

rant and demanded the return of the thirteen hundred dollars. Apro refused to return the money.

The actual debts against the restaurant business, at the time of these negotiations, as thereafter listed in Apro's schedules in the bankruptcy proceeding, consisted of twenty-four items aggregating $6,763.63.

The trial court entered findings of fact, conclusions of law, and judgment for plaintiff. Defendant appeals.

■ The trial court found that no agreement for the sale and purchase of the restaurant had been reached, and that appellant had refused to proceed further with the sale and had declined to negotiate further in reaching an agreement. While appellant challenges these findings, he argues but briefly on the point. Our examination of the record convinces us that these findings of fact are not contrary to the clear preponderance of the evidence.

■ Had it not been for appellant's discharge in bankruptcy, these findings would entitle respondent to recover on the theory of money had and received. In view of that circumstance, however, appellant is relieved of that obligation unless the thirteen hundred dollars was obtained "by false pretenses or false representations." Section 17(a)(2) of the bankruptcy act (11 U.S.C.A. § 35(a)(2)). The proper scope and meaning of this provision of the bankruptcy act, excepting certain liabilities from discharge, is stated as follows in Collier on Bankruptcy:

"The frauds included in the portion of clause (2) under discussion are those which in fact involve moral turpitude or intentional wrong; fraud implied in law, which may exist without imputation of bad faith or immorality, is insufficient. It must further affirmatively appear that such representations were knowingly and fraudulently made, and that they were relied upon by the other party. . . . The fraud necessary to prevent the effect of a discharge must exist at the inception of the debt. When it is once determined that the property was obtained prior to the making of any false representation, subsequent misrepresentations will have no effect upon the discharge of the debt. A mere promise to be executed in the future is not sufficient to make a debt non-dischargeable, even though there is no excuse for the subse-

quent breach." 1 Collier on Bankruptcy (14th ed.) 1602, § 17.16.

Having this provision of the bankruptcy act in view, the court found that, during the negotiations, appellant falsely represented to respondent (a) that the debts existing against the business totaled a certain figure (which figure was substantially less than the actual amount of such debts); (b) that the business and personal property were free from all liens and that appellant had full right to sell the same; and (c) that appellant would fully comply with the sales in bulk statute, whereas he had no intention of abiding by such representation, and did, in fact, make a false form of affidavit and list of creditors. The trial court further found that these false representations were made for the purpose of deceiving respondent and inducing him to part with his money; and that respondent did part with the thirteen hundred dollars in reliance upon these representations.

Appellant assigns as error the findings of fact relative to the making of such false representations, and respondent's reliance thereon. We will first consider the asserted false representation as to the amount of debts existing against the business.

At the outset of the negotiations appellant represented the approximate debt against the business as consisting of six items aggregating $5,237. In fact, however, twenty-four items were then chargeable against the business, the total amounting to $6,763.63. This was a three hundred per cent increase in number of debt items and a twenty-nine per cent increase in total business debt over the approximate figures first given.

■ ■ The word "approximately" means "nearly," "about," "close to." *American Trust & Safe Deposit Co. v. Eckhardt*, 331 Ill. 261, 162 N. E. 843, quoted with approval in *In re Searl's Estate*, 29 Wn. (2d) 230, 242, 186 P. (2d) 913, 173 A. L. R. 1247. In the *Eckhardt* case the court noted that these words were elastic and, to some extent, indefinite. Where, however, the information which is represented to be approximately correct is based upon a mathematical com-

putation derived from facts within the knowledge of the person providing the information, the variance between such information and the actual fact must be relatively slight if such information is to be regarded as an approximation. *Hartsman v. Mueller,* 195 Wis. 485, 218 N. W. 854; *Vaughan v. Ford,* 162 Mich. 37, 127 N. W. 280.

In the instant case appellant knew, when he first advertised this restaurant for sale several weeks before the negotiations in question, that the number, identity and aggregate amount of debts against the business would enter into the transaction. All of this information was within the knowledge of appellant, as demonstrated by the fact that the debts were later correctly listed in the bankruptcy schedules. We perceive no reason why a nearly correct figure could not have been given. Under the circumstances, we are of the opinion that appellant's statement that the business debts were approximately $5,237 was a material misrepresentation.

Nor do we find merit in the argument that respondent did not rely upon this representation and that he was therefore not damaged by it. This contention is based on the fact that, regardless of the actual amount of debts, appellant was in no event required to pay more than $7,750 for the restaurant business.

This argument overlooks the fact that, entirely apart from the purchase price or the amount of debts to be assumed by respondent, the aggregate of all business debts was a relevant factor to be considered by respondent in determining whether the venture had prospects of success. Had respondent known that the actual amount of debts approached fairly close to the total purchase price, he might well have concluded that the business was a losing proposition.

Moreover, the gross understatement of debts prejudiced respondent in view of his responsibilities, as purchaser, under the bulk sales law. Rem. Rev. Stat., § 5832 [P.P.C. § 352-1] *et seq.,* as amended. Under that act it was respondent's duty to apply all of the purchase price, *pro rata,* upon the payment of all debts against the business.

*Spokane Merchants' Ass'n v. Koska,* 118 Wash. 445, 203 Pac. 969. By understating the debts, appellant induced respondent to pay to appellant thirteen hundred dollars which should have gone to the creditors. Had the sale been consummated, the unpaid creditors would have had recourse against the property sold to respondent, or, if the property could not have been pursued, against respondent personally. *Minder v. Gurley,* 37 Wn. (2d) 123, 222 P. (2d) 185.

We conclude that the record amply sustains the trial court's findings of fact relative to the representation as to the amount of business debts and respondent's reliance thereon. These findings are sufficient to support the provision in the judgment to the effect that the obligation sued upon is not affected by appellant's discharge in bankruptcy. It is therefore unnecessary to consider whether the evidence is sufficient to support the findings of fact as to other representations.

Appellant's next assignment of error involves respondent's use, as a witness, of notes prepared by him immediately prior to the trial. Respondent used these notes to refresh his present recollection regarding the details of the transaction. Appellant first asserts that it was an abuse of discretion to permit the witness to use these notes without first establishing that he had need of the notes to refresh his recollection.

When appellant first objected to the use of the memorandum, the trial court denied a motion that the witness be required to lay the notes aside until he found them necessary in connection with specific questions. The court, however, specifically instructed the witness not to use the memorandum unless it was necessary. When appellant later renewed his objection, the trial court repeated its instruction. At this point, counsel for respondent voluntarily took the notes away from the witness. Appellant later cross-examined respondent at length regarding asserted discrepancies between his testimony and the memorandum. At the conclusion of this cross-examination, appellant placed all of these notes in evidence, as an exhibit, for the apparent purpose of undermining respondent's credibility as a witness.

▇ While there are decisions to the contrary, the general rule appears to be that it is necessary, in the absence of circumstances already appearing in the record, to lay a foundation for the use of a memorandum for refreshing of memory, by showing the need of using the memorandum. 5 Jones Commentaries on Evidence (2d ed.) 4674, 4681, §§ 2379, 2382; 125 A. L. R. 19, 27, annotation. Here, however, the memorandum itself was placed in evidence by appellant. This amounted to a waiver of any objection to its use by respondent. *Illinois Cent. R. Co. v. Doss,* 159 Ky. 57, 166 S. W. 785. It is therefore unnecessary to inquire whether, in this case, a proper foundation was laid for the use of the memorandum by the witness.

▇ What has just been said also disposes of appellant's contention that, as revealed by the cross-examination of the witness, the memorandum was not actually used to refresh the memory of the witness, but to lead the witness into making the desired answers. For the same reason, the objection that the memorandum was a carbon rather than the original, is without merit. It may also be said, on this last point, that where, as here, the purpose of the memorandum was to revive present recollection, it is immaterial that the memorandum which served as a stimulus is only a copy. 5 Jones Commentaries on Evidence (2d ed.) 4678, § 2381.

▇ The final assignment of error has to do with the receipt, over objection, of testimony which appellant asserts shows an offer of settlement. The rule here invoked is that offers of compromise are not admissible against the interest of the party making them. *Svea Fire & Life Ins. Co. v. Spokane, P. & S. R. Co.,* 175 Wash. 622, 28 P. (2d) 266.

On direct examination respondent was asked whether, at a conference held on August 30th, Apro had made any offer to return any portion of the money. Appellant interposed his objection, whereupon the following colloquy took place:

"THE COURT: Well, I will sustain the objection to the answer given. He may bring out any conversation that was had.

"MR. PRUZAN: I don't think they can bring out negotia-

tions for settlement. That's against the policy of the law altogether.

"THE COURT: No, that's true, but I say any conversations regarding the enterprise is admissible but if there is anything relating to settlement that isn't, if it's purely a matter of settlement.

"Q. What, if anything, did Mr. Apro say?

"MR. PRUZAN: I object to that on the ground that it's not a complete enough question. He's not directed to anything in particular at all.

"THE COURT: He may answer.

"A. He said that he would take the 'hocus-pocus' off the whole thing for $500, and he would give me the rest of the money, and take his restaurant back, and we would forget the whole thing.

"MR. PRUZAN: Move that be stricken on the ground that it's obviously an offer and settlement.

"THE COURT: Oh, I think I will let it stand, Mr. Pruzan."

The record, as quoted above, indicates to us that appellant's objection was sustained in so far as it tended to show an offer of compromise. Apart from this, the question and answer had significance with respect to the independent question of whether appellant had refused to complete the transaction. Whatever the "hocus-pocus" was that Apro was willing to take off for five hundred dollars, the fact that his thinking lay in that direction is some indication that he was unwilling to make the changes in the contract and bulk sales affidavit as requested by respondent.

The judgment is affirmed.

SCHWELLENBACH, C. J., HILL, FINLEY, and OLSON, JJ., concur.